AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Indiana

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| DEMETRIS CAMPBELL (-01) | ) | 1:20-mj-0686 |
| ANGEL MONTANO (-02) | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 19, 2020 and July 28, 2020___ in the county of ___Marion___ in the

___Southern___ District of ___Indiana___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Interference in Interstate Commerce |
| 18 U.S.C. § 924(c) | Branishing a Firearm in Commission of a Violent Crime |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

_____
s/ Leonard Rothermich
*Complainant's signature*

Leonard P. Rothermich, Special Agent/FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by
___telephone___ (*reliable electronic means*,

Date: __August 12, 2020__

City and state: _____Indianapolis, IN_____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT AND ARREST WARRANT

I, LEONARD P. ROTHERMICH, being duly sworn according to law, depose and state as follows:

## I. INTRODUCTION

1.      I am and have been employed as a Special Agent with the Federal Bureau of Investigation ["FBI"] since November of 2014.  Prior to that time, I spent 22 weeks training to be a Special Agent at the FBI Academy in Quantico, Virginia beginning on June 15, 2014. Through the FBI, I have received extensive training related to the investigation of federal crimes to include violent crime and firearms offenses.  Prior to this, I spent five years on active duty in the United States Army as an officer in the Military Police Corps.  I am currently assigned to the FBI Violent Crime Task Force ["VCTF"] in the Indianapolis Field Office of the FBI.  In this assignment, I investigate all manner of violent crime, to include armed commercial robberies and firearm related offenses.

2.      This affidavit is submitted in support of an application for Warrants for Arrest of Demetris Campbell ["CAMPBELL"], black male, date of birth ["DOB"] XX-XX-1994; and Angel Montano ["MONTANO"], black male, DOB XX-XX-2001.  Based on my training and experience, and based on the facts below, there is probable cause to believe that the CAMPBELL and his co-conspirators, to include MONTANO, committed multiple counts of being in violation of Title 18 United States Code, Sections 1951(a)(1) and 924(c) between the dates of July 19, 2020 and July 28, 2020.  Based on the obtained statements and evidence within this investigation, your Affiant believes that there is probable cause to prove the following:

1

    a.   CAMPBELL and other unknown subjects committed an armed robbery of VICTIM 1 and VICTIM 2 within the vicinity of 4354 Mill View Court, Indianapolis, Indiana, on July 19, 2020, which was orchestrated and facilitated through the online marketplace OfferUp.

    b.   CAMPBELL, MONTANO, and other unknown subjects committed a robbery of VICTIM 3, VICTIM 4, and VICTIM 5 within the vicinity of 6830 Mill View Court, Indianapolis, Indiana, on July 20, 2020, which was orchestrated and facilitated through the online marketplace OfferUp.

    c.   CAMPBELL committed an armed robbery of VICTIM 6 within the vicinity of 4354 Mill View Court, Indianapolis, Indiana, on July 22, 2020, which was orchestrated and facilitated through the online marketplace LetGo.

    d.   CAMPBELL, MONTANO, and other unknown subjects committed an armed robbery of VICTIM 7 and VICTIM 8 resulting in death within the vicinity of 2054 Adams Street, Indianapolis, Indiana, on July 28, 2020, which was orchestrated and facilitated through the online marketplace OfferUp.

3.    Your Affiant knows that OfferUp and LetGo are internet-based user-to-user marketplaces, which are described more fully herein:

    a.   OfferUp:  OfferUp is an online marketplace that can be accessed either through the URL www.offerup.com or its associated telephone-based application.  In either interface, a subscribed user can advertise the sale of an item that they currently own.  A user can also directly communicate with a seller about an advertised item.  A person subscribes to the marketplace by registering their email address with the website.  The seller can then post photos of an offered item as

2

well as whatever price that he or she wants to sell it for.  A potential buyer can use the website or application to search for items for sale within the marketplace based on their current location.  OfferUp will attempt to prioritize the listing of available items based on how close in proximity the seller of the items are to the buyer's registered location.  The buyer can then message the seller directly to make his or her interest in an item known and to initiate the transaction.  The two parties then use the interface to negotiate a final price as well as how and where the final exchange will take place.  OfferUp's headquarters is located in Bellevue, Washington, and the enterprise owns internet servers located outside the state of Indiana, which facilitate this type of interstate communication in pursuit of a transaction between two persons.

b. LetGo:  Much like OfferUp, LetGo is also an online marketplace that can be accessed either through the URL www.letgo.com or its associated telephone-based application.  In either interface, a subscribed user can either advertise the sale of an item that they currently own or directly communicate with a seller about an advertised item.  A person subscribes to the marketplace by the registering their email address with the website.  The seller can then post photos of an offered item as well as whatever price that he or she wants to sell it for.  A potential buyer can use the website or application to search for items for sale within the marketplace based on their current location.  OfferUp will attempt to prioritize the listing of available items based on how close in proximity the seller of the items are to the buyer's registered location.  The buyer can then message the seller directly to make his or her interest in an item known and to initiate the

transaction.  The two parties then use the interface to negotiate a final price as well as how and where the final exchange will take place.  LetGo's headquarters is located in New York, New York, and the enterprise owns internet servers located outside the state of Indiana, which facilitate this type of interstate communication in pursuit of a transaction between two persons.

4.      Title 18, United States Code, Section 1951(a) states:  Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

5.      Title 18, United States Code, Section 924(c) states:   Any person, who carries, brandishes, or uses a firearm during a crime of violence, in furtherance of such a crime, shall, in addition to the punishment provided for such a crime of violence, be sentenced to a term of imprisonment not less than seven years. If death results from the use of such a firearm, it shall be punished by death or sentenced to a term of imprisonment for any term of years or for life.

6.      The statements contained in this affidavit are based in part on information provided by, and conversations held with, Special Agents and Task Force Officers ["TFOs"] of the FBI; detectives and patrol officers of the Indianapolis Metropolitan Police Department ["IMPD"]; witnesses; and on my experience and background as a Special Agent of the FBI.

7.      I have not included each and every fact that has been revealed through the course of this investigation.  I have set forth only the facts that are believed to be necessary to establish the required foundation for this issuance of the requested Warrant for Arrest.

4

## II. BACKGROUND OF THE INVESTIGATION

8.      On July 19, 2020, VICTIM 1 communicated with an unknown person, who maintained the username "Man With The Plan" ["MWTP"] on the internet-based marketplace OfferUp.  The purpose of the communication was for VICTIM 1 to purchase an iPhone 11 Pro Max from him.  The user of the MWTP account provided VICTIM 1 with the Indianapolis address of "4354 mill view ct", which was where he was willing to meet to complete the transaction.  To note, your Affiant knows this address to be within the Pepper Mill Apartment complex, located on North Shadeland Avenue in Indianapolis, Indiana.  The user also provided VICTIM 1 with the phone number of "219-359-7650" ["x7650"] that he could be reached at for further communication.  The two parties agreed on a price of $400 for the iPhone, and VICTIM 1 additionally agreed to meet the user at the provided address.  VICTIM 1 brought his father, VICTIM 2, along with him to the transaction location.  Upon their arrival, three black males ["ROBBER 1", "ROBBER 2", and "ROBBER 3"] approached their vehicle.  VICTIM 2 would later recall to IMPD officers that ROBBER 1 appeared to be physically smaller than the others.  ROBBER 1 approached VICTIM 1's window and showed him what appeared to be an iPhone 11 Pro Max.  The ROBBERS then brandished pistols and demanded the VICTIM'S money.  Following the initiation of the robbery, one of the ROBBERS also struck VICTIM 1 in the face with his pistol, which caused him great physical pain.  The ROBBERS ultimately stole loose US currency from both of the VICTIM'S wallets as well as VICTIM 1's Nike Air Jordan tennis shoes that he was wearing.  The ROBBERS then fled the area, and VICTIM 2 contacted 911.  The IMPD responded to the scene and initiated an investigation.

9.      On July 20, 2020, VICTIM 3 communicated with the MWTP account over the OfferUp application.  She initiated contact with him in order to inquire about his account's

posted advertisement of an iPhone 11 Pro Max for $800.  The MWTP user instructed VICTIM 3 to meet him at "4354 mill view ct."  VICTIM 3 brought along her two juvenile children, VICTIM 4[1] and VICTIM 5[2], to the transaction.  Upon their arrival, she communicated to the user over OfferUp that she was there and what kind of vehicle she was in.  The user replied a minute later over the OfferUp application:  "Okay here I come."  Shortly thereafter, a black colored Jeep parked behind VICTIM 3's vehicle, in a position that blocked her from driving away.  A black male ["ROBBER 1"] then exited from the Jeep and approached VICTIM 3 at her driver's side window.  He reached into her vehicle and placed the muzzle of a pistol against her thigh.  He demanded "everything", so VICTIM 3 gave him her rose gold colored iPhone 11 as well as VICTIM 4's silver iPhone 6 and Apple AirPods.  ROBBER 1 then re-entered the Jeep, and the vehicle drove out of her line of sight.  VICTIM 3 immediately drove her and her children out of the apartment complex and to the nearby Dollar General, located at 4502 North Shadeland Avenue, Indianapolis, Indiana.  She called 911, and officers with the IMPD responded to the scene.  Given that VICTIM 3 was Hispanic and that English was not her first language, a fluent Spanish-speaking employee of the Dollar General translated VICTIM 3's statement to the officers that day.  IMPD subsequently opened an investigation into the matter.

10.     On July 21, 2020, CAMPBELL sold VICTIM 3's stolen rose gold colored iPhone 11 through an EcoATM, which was located inside of the Kroger grocery store at 4445 East 10th Street, Indianapolis, Indiana.  To note, your Affiant knows EcoATMs to be independent merchant stations located within certain businesses and locations throughout a given city.  These stations' sole function is to allow individuals to sell their cell phone, MP3 player, or computer

---

1 VICTIM 4's age was 13-years-old at the time of this incident.
2 VICTIM 5's age was 8-years-old at the time of this incident.

tablet for a predetermined price.  The seller specifically deposits the device into the machine and then provides their legal name and fingerprint as part of the transaction.  The machine also takes a photograph of the seller as he or she is standing before the station during the transaction process.  All of this information, to include the obtained information identifying the sold item, is retained in an online database called LeadsOnline, which law enforcement has access to. Investigators can query the database to search for items, such as cell phones, that are known to have been previously stolen in order to see if any person has since sold it to an EcoATM for cash.  During CAMPBELL's sale of VICTIM 3's iPhone, he was required to provide all of the above-described information.

11.     On July 22, 2020, VICTIM 6 agreed to purchase an iPhone 11 Pro Max from an unknown user through the online marketplace LetGo.  The seller maintained an account name of "Simone".  VICTIM 6 agreed to buy the iPhone from Simone for $560.  Simone directed VICTIM 6 to meet at "4354 mill view ct."  Upon her arrival, VICTIM 6 informed the seller over the LetGo application that she was there and what type of vehicle she was in.  The user replied a minute later over the LetGo application by stating, "Okay here I come."  ROBBER 1 then approached VICTIM 6 from an unknown location and brandished a pistol.  ROBBER 1 wore a mask covering the lower portion of his face.  He stated to her, "I'll shoot you! Give me the cash!" VICTIM 6 complied by giving him the $560 in loose US currency that she had brought for the transaction as well as her Samsung cell phone.  ROBBER 1 then fled from the scene. VICTIM 6 returned home, so that she could contact the police to report the incident.

12.     VICTIM 6 described ROBBER 1 as being a very thin black male that was approximately 5'7" and that he appeared to be in his late teens or early 20's of age.  She further described him as having maintained a short haircut and had bushy eyebrows.  Through the course

7

of this investigation, your Affiant became very familiar with MONTANO's physical features. Therefore, your Affiant is aware that MONTANO is 5'6", 120 lbs, and has short hair with larger defined eyebrows.

13.     Between July 21, 2020 and July 27, 2020, VICTIM 7 participated in ongoing contact with a user named "Tony Reese" ["Reese"] on OfferUp regarding the advertised sale of two iPhone 11 Pro Maxes for $1400.  VICTIM 7 ultimately agreed to the price, and Reese provided him with the address of 2713 Braxton Drive, Indianapolis, Indiana to complete the sale. VICTIM 7 drove to the residence and informed Reese over the OfferUp application that he had arrived.  Reese then asked him what kind of car he was in.  VICTIM 7 responded "Are you serious I'm right in front of your house."  Reese responded "Okay here I come" and three black males suddenly approached VICTIM 7's vehicle wearing masks that covered the lower portion of their faces.  They presented him with an iPhone, and VICTIM 7 looked at it before finally informing them that he intended to complete the transaction through PayPal.  The males stated that they did not have a PayPal account, so VICTIM 7 eventually offered to drive to a nearby Wal-Mart to buy one of them a PayPal card.  When they agreed to his idea, VICTIM 7 drove away and did not return.

14.     VICTIM 7 later explained to detectives with the IMPD that he owns a business where he specializes in repairing and unlocking cell phones.  He also purchases used cell phones in order to wipe them and resell them. The business is called Indy Cells.  He stated that he did not return to the Braxton Drive address that day, because he felt that the situation became

suspicious when the three males approached him.  He explained that this was very unusual compared to many of the other transactions that he had done.

15.     However, later that night, VICTIM 7 obtained the previously agreed upon amount of cash to complete the transaction.  Despite his original concerns, he re-engaged Reese about the advertised iPhones.  Reese informed that the phones were still available, so VICTIM 7 provided him with his personal cell phone number that he could be reached at for further communication.  He then began receiving text messages from an iCloud account maintaining the registered email address of BigModdy74@iCloud.com ["BM74"].  Given the context of their ensuing text message conversation, VICTIM 7 believed that the person he was writing to was still Reese.  The email address ultimately messaged VICTIM 7 to meet him at "2054 Adams St." Given the circumstances of the previous attempted transaction on the day prior, VICTIM 7 asked his brother, VICTIM 8, to join him.  VICTIM 8 decided to bring his pistol before leaving.  They drove in VICTIM 7's black Pontiac Grand Prix, bearing Indiana license plate BUF686.

16.     VICTIM 7 arrived with VICTIM 8 at approximately 3:07 pm on the afternoon of July 28, 2020.  VICTIM 7 sent BM74 a text messaging stating "What you on bro? You got me pulling up to abandoned houses."  A blue colored Ford Focus bearing Indiana temporary tag 2568410 quickly pulled up directly behind VICTIM 7's vehicle that was parked in front of 2054 Adams Street and idled.  VICTIM 7 observed what he believed to be multiple males occupying the Focus.  The Focus eventually drove south down Adams Street and out of their sight.  Both VICTIM 7 and VICTIM 8 briefly discussed how they no longer felt comfortable with the situation playing out before them.  Within a few minutes of arriving, VICTIM 7 began to drive away.  As he drove south on Adams Street, he received another text from BM74 that said "Where you going bro?"  When the VICTIMS reached the corner of Adams Street and East 20th

9

Street, the blue Ford Focus suddenly cut them off from the opposite direction and parked in a fashion that prevented them from continuing forward. ROBBER 1 then exited from the driver's seat and brandished what VICTIM 7 would later describe to be a "Mini AK" or "Draco" style firearm. VICTIM 7 noticed that ROBBER 1 was small, had tattoos on his arms, and a gap in his front teeth. VICTIM 7 further noticed that the Focus had what appeared to be damage from bullet holes. ROBBER 1 approached the driver's side window and tapped on it with the muzzle of his gun. Both VICTIM 7 and VICTIM 8 put their hands up and continually stated that they did not have anything to give him. ROBBER 1 then fired multiple rounds into VICTIM 7's vehicle, which hit him three times as well as killed VICTIM 8. VICTIM 8 managed to return fire, causing ROBBER 1 to flee the area on foot, before becoming incapacitated. VICTIM 7 drove him and his brother to the nearby Rural Pantry, located at 1856 North Rural Street. Upon his arrival, he contacted 911 and reported the attempted robbery and shooting.

17.     The IMPD responded to the scene of the report as well as the intersection of 20th Street and Adams Street. They observed multiple expended 9mm shell casings in the intersection where VICTIM 7 reported the shooting to have happened. However, the blue Ford Focus was nowhere to be found. Detectives located an individual ["the COOPERATING WITNESS[3]"] on the 20th block of Adams Street. The COOPERATING WITNESS corroborated VICTIM 7's statement in that he/she observed a blue Ford Focus had blocked in the VICTIM'S vehicle and that the driver of the Ford fired multiple shots at them before fleeing.

18.     As part of the IMPD's immediate follow-up of their homicide investigation, they requested their Crime Lab unit to process VICTIM 7's Pontiac Grand Prix. As part of this effort,

---

3 Your Affiant and detectives from the IMPD know the true identity of the COOPERATING WITNESS, however it is not being disclosed in this Affidavit.

certified evidence technicians recovered unidentified fingerprints from the backside of the driver's side sideview mirror.  The IMPD then submitted these prints to the IMPD Latent Print Unit for comparisons.

19.    Detectives and TFOs from the IMPD Covert Robbery Unit ["IMPD CRU"] and FBI VCTF located the blue Ford Focus later that evening.  It remained parked outside of the vicinity of 4118 Elmont Terrace throughout the majority of the night.  After multiple hours of inactivity in or around the Focus, the IMPD discontinued active surveillance on it.  The following morning, on July 29, 2020, the IMPD re-located the Ford Focus driving in the vicinity of East 38th Street and Post Road.  The IMPD conducted a traffic stop of the vehicle and took its lone occupant into custody.  The occupant was confirmed to be MONTANO.  The officers noticed that the vehicle had damage from what appeared to be multiple bullet strikes.  They ultimately had the Focus towed to police custody in lieu of a search warrant.  During an inventory search of its contents prior to being towed, the officers witnessed a black semiautomatic pistol concealed underneath the driver's seat.  They then transported MONTANO to the IMPD Homicide Office for questioning.

20.    Upon his arrival, IMPD Detectives Matthew Pankonie ["Det. Pankonie"] and Erika Jones ["Det. Jones"] presented MONTANO with his *Miranda* rights, which he stated that he understood and waived by signing an IMPD Advice of Rights form.  MONTANO stated that he had been the sole driver and occupant of the Ford Focus throughout the day prior, on July 28, 2020.  However, he did not admit to any knowledge of a robbery or shooting.  When asked why the vehicle was found parked at 4118 Elmont Terrace the night prior, MONTANO answered that his "sister" lived there and that he stayed there sometimes.  He further stated that he also went to his girlfriend's house that day, who he described as living near East 38th Street and Post Road.

11

The detectives noticed during their interview of him that he maintained tattoos on his arms and had a gap between the front of his teeth, which appeared to match VICTIM 7's description of ROBBER 1.  The IMPD ultimately arrested MONTANO that day for his unlawful possession of a firearm and narcotics located within the Ford.

21.     As the above events transpired, the IMPD CRU and FBI VCTF investigated the series of online marketplace robberies that had transpired between July 19, 2020 and July 22, 2020, as previously described.  As part of this investigation, they obtained a warrant from the Marion County (Indiana) Superior Court ["MCSC"] to ping the x7650 phone number originally provided by the MWTP OfferUp account to VICTIM 1 during the July 19th robbery.  Sprint executed the ping and also provided subscriber information for the target number, per the orders within the warrant.  Once they received the requested records, they learned that CAMPBELL was the subscribed owner of the phone account.

22.     Furthermore, the IMPD CRU, in partnership with the assigned IMPD Robbery detectives for each incident, obtained records pertaining to the OfferUp and LetGo accounts involved in the ongoing spree.  This included records for the MWTP OfferUp account and the Simone LetGo account.  Each of these records were obtained through warrants authorized by the MCSC.  The provided records specifically contained subscriber information, user-to-user message content organized by date and time, as well as IP log-in and log-out information.  The IMPD observed content within the two suspect records that corroborated the series of events

leading up to each of their respective robberies, as described by the VICTIMS.  The following

pertinent information was also located amongst the two target accounts:

    a.   The MWTP and Simone accounts each maintained the same registration email,

        which a new user would have to provide in order to create the account.  The email

        was simonew613@gmail.com

    b.   The creator of the MWTP account registered the x7650 phone number to it.

    c.   The Simone account provided the x7650 phone number multiple times to various

        prospective buyers as a way to contact him.

    23.    Following the attempted robbery of VICTIM 7, Det. Pankonie entered the

presumed alias "BigModdy74" (as identified as the iCloud user name that lured VICTIM 7 to the

vicinity of 2054 Adams Street earlier that day) into the Google internet search engine.  Google

provided a link to an Instagram profile page for "Big Moddy 74", which maintained a URL of

www.instagram.com/hunnitdollar.moddy. The handle for the account was

"@hunnitdollar.moddy".  This page showed multiple pictures posted of CAMPBELL in a nature

that caused the IMPD to strongly believe that he was the owner of this Instagram account.  One

of the pictures posted to the account approximately four weeks from the date of the investigation,

showed CAMPBELL posing with his arm around MONTANO.  Both males were making

gestures with their hands that your Affiant knows in his investigative experience to likely be

gang-affiliated symbols.  MONTANO also maintained a black semiautomatic pistol in his other

hand.

    24.    Later in the day on July 29, 2020, the IMPD CRU, FBI VCTF, and the US

Marshal Service ["USMS"] identified CAMPBELL's x7650 as actively pinging in the vicinity of

2058 Adams Street, Indianapolis, Indiana.  The agencies immediately initiated active physical

surveillance on the address.  Law enforcement eventually observed CAMPBELL exit from the residence and depart in a vehicle.  Covert investigators followed him to a gas pump located at a Kroger Fuel Center, at 4445 East 10th Street, Indianapolis, Indiana.  To note, this Fuel Center was located directly in front of the Kroger within the Linwood Square Shopping Center which was where CAMPBELL sold VICTIM 3's rose gold colored iPhone on July 21, 2020.  Officers placed CAMPBELL into custody and transported him to the IMPD Homicide Office for questioning.  At the time of his arrest, he had an iPhone on his person, which was registered to the x7650 phone number.  The IMPD seized the phone as evidence and transported it to the IMPD Property Room.

25.   Upon CAMPBELL's arrival, Det. Pankonie and TFO Nick Andrews ["TFO Andrews"] presented him with his *Miranda* rights.  CAMPBELL stated that he understood his rights and voluntarily waived them by signing an IMPD Advice of Rights form.  He ultimately admitted that he had maintained and utilized OfferUp and LetGo to commit robberies.  More specifically, he admitted to creating false advertisements on the online marketplaces in order to lure customers into transactions where they would ultimately be robbed of the cash that they brought for it.  He stated that he used the previously identified simonew614@gmail.com email address and the x7650 phone number to register and use the multiple accounts that he maintained on these marketplaces.  These accounts included the MWTP, Simone, and Reese accounts previously identified.  CAMPBELL explained that he would set the robbery up by communicating directly with potential buyers.  Once he had a buyer ready to meet, he would instruct them to go to a predetermined location.  From there, MONTANO would also be there at the agreed upon time and rob the buyers at gun point.  CAMPBELL made sure to ask the buyer what kind of car they were in once he or she notified him that they had arrived.  He would then

14

communicate this information to MONTANO in order for him to complete the robbery. CAMPBELL informed investigators that MONTANO committed all of the robberies that he initiated on OfferUp or LetGo on July 19th, July 20th, July 22nd, and July 28th.  However, he stated that he did not know the true names of anyone else that MONTANO would bring along with him.  CAMPBELL stated that he never showed up to the robbery itself. His job was only to set them up.  MONTANO would then give him a cut of the cash proceeds after they were done.

26.     Furthermore, CAMPBELL recalled and provided details from the three robberies previously described in this Affidavit on July 19th, July 20th, and July 22nd.  This included locations that he sent the VICTIMS and the accounts that he used to do it.  CAMPBELL also recalled details regarding the final robbery that he set-up on the day prior.  He specifically recalled communicating with VICTIM 7 for a few days before it finally happened.  He explained that he actually set up two different meetings with VICTIM 7.  The first time they intended to rob him, VICTIM 7 informed the males that were waiting for him that he only had PayPal to complete the transaction.  So the group decided against completing the robbery since no cash would seemingly be present.  When VICTIM 7 re-engaged CAMPBELL the next day, CAMPBELL created a PayPal account.  He planned with MONTANO to actually sell VICTIM 7 some cell phones on Adams Street.  Then, once the transaction went through electronically, MONTANO would then commit an armed robbery of VICTIM 7 to get the phones back.

27.     Once CAMPBELL had created a PayPal account and confirmed that VICTIM 7 was coming to the address that he had provided him, he made a FaceTime call to MONTANO. He informed MONTANO:  "I'm about to sell these phones."  CAMPBELL quoted MONTANO as merely stating "Big Moddy, I'm on that."  CAMPBELL explained to the detectives that

MONTANO meant that he was going to "rob" VICTIM 7.  CAMPBELL then, knew that their

adapted plan was now in motion.

28.     CAMPBELL admitted to being physically present at 2058 Adams Street when

VICTIM 7 arrived on July 28th, as previously planned with MONTANO.  He remembered

MONTANO arriving in his blue Ford Focus and parking directly behind VICTIM 7, who he

remembered being in a black colored Pontiac.  MONTANO then drove away and began circling

the block.  However, VICTIM 7 drove away before CAMPBELL could step outside to make the

transaction happen.  He remembered texting VICTIM 7 asking where he was going.

CAMPBELL then watched from his house as MONTANO cut VICTIM 7 off and exited from his

vehicle towards the driver's side window.  It appeared a brief exchange transpired between the

occupants of the Pontiac and MONTANO before MONTANO initiated the shooting. Moments

later, MONTANO arrived on foot at 2058 Adams Street.  He informed CAMPBELL that he had

decided to start shooting at the VICTIMS because they "smiled" at him.

29.     CAMPBELL knew MONTANO to carry what he referred to as a "Draco" style

firearm.  This was the firearm he believed that MONTANO had used to commit the shooting that

day.  He also knew MONTANO to own and carry other types of firearms, to include a Glock

pistol.

30.     Det. Pankonie presented CAMPBELL with a photo array, which contained

pictures of six similar-looking males.  The males were specifically similar in skin tone and facial

features.  The purpose of the photo array was to see if CAMPBELL recognized any of the

individuals pictured in it, one of which Det. Pankonie knew to be MONTANO.  CAMPBELL

identified MONTANO's photo as the person he knew to be MONTANO.

31.     The IMPD then arrested CAMPBELL for his participation in the above described

events.

32.     Also on July 29, 2020, Det. Pankonie met with VICTIM 7 at the hospital, where

he was still being treated for his gunshot wounds.  Det. Pankonie presented him with a photo

array of six similar-looking males, one of which Det. Pankonie knew to be MONTANO.

VICTIM 7 looked at all six photographs and stated that MONTANO's picture looked familiar to

him, unlike the other five pictured individuals.  He asked Det. Pankonie if this person had a gap

in his teeth and tattoos on his arm.  Det. Pankonie said that he could not answer that.  VICTIM 7

ultimately identified MONTANO as ROBBER 1 and circled his picture on the photo array.  He

added "I believe that's the guy, I'd have to see him in person."

33.     On July 30, 2020, TFO Andrews individually presented VICTIM 3 and VICTIM

4 with separate photo arrays.  TFO Andrews knew one of the males in each of the arrays to be

MONTANO.  Both VICTIM 3 and VICTIM 4 positively identified MONTANO as ROBBER 1

from the armed robbery on July 20, 2020.

34.     The IMPD obtained a warrant to search CAMPBELL's seized iPhone maintaining

the x7650 phone number.  The execution of the warrant recovered MMS/SMS text messages

stored on the device among other saved data.  A review of these messages showed a picture of

MONTANO holding what appeared to be a Draco NAK-9 automatic pistol.  Your Affiant knows

17

this through communication with other law enforcement that this particular gun fires 9mm caliber bullets.  The picture had been sent to him as part of a text message on July 21, 2020.

35.     This same day, the IMPD executed a warrant on 9051 East 38th Place, Indianapolis, Indiana.  This address was registered to Jayla Maxie ["Maxie"], who was the known girlfriend of MONTANO.  During the search, detectives located a bag containing 9mm ammunition.  They seized this as potential evidence.  Det. Pankonie and Det. Jones then conducted an interview of Maxie.  She admitted to knowing MONTANO.  She further stated that she had seen him carrying a "Baby AK" on July 26, 2020.[4]  The blue Ford Focus was hers, but she only allowed him to have access to it.  She stated that she had initially been driving it earlier in the day on July 28th.  She thought that MONTANO came over around 1:00 pm and borrowed her Focus around that time.  He did not come back with it until around 4:00 pm that afternoon.

36.     Later that night, MONTANO contacted Maxie through the Marion County (Indiana) Jail ["MCJ"] phone system.  This system allowed inmates to make outgoing phone calls from the jail.  The MCJ gave each inmate a designated PIN from which they could access their specific phone account.  The phone system then recorded these outgoing calls and maintained them in a searchable online database.  The IMPD and your Affiant reviewed many of MONTANO's recorded jail calls following his incarceration on July 29, 2020.  Through a review of his calls, the IMPD and your Affiant were able to locate a call that he made to Maxie on July 30th, immediately following the IMPD's execution of the warrant on her residence. Maxie was

---

4 Your Affiant and the IMPD detectives involved believe base on their training and experience that a "Baby AK" is a common nickname for a Draco-style firearm.

agitated in the call and explained to MONTANO how the police had seized his "bullets" from a closet in her apartment.  MONTANO responded with the following:

      a.  "All right, though, that's cool, that's cool.  Because them bitches brand new."

37.     Maxie then informed MONTANO that the IMPD had also taken his cell phone that he had left at her house.  MONTANO responded to this revelation by stating after a brief pause:

      a.  "All right. It's cool, cause…you feel me, we ain't never say shit on the phone neither."

38.     On July 31, 2020, your Affiant and members of the IMPD CRU executed a search warrant at the residence located at 4118 Elmont Terrace, Indianapolis, Indiana.  This residence was where Maxie's blue Ford Focus was first located on July 28th following the initiation of the homicide investigation, as previously explained.  MONTANO had also previously told investigators during his post-arrest statement that his "sister" lived there.  The purpose of the warrant was a continued effort to locate MONTANO's Draco NAK-9.  Investigators had since learned that Kierra Summers ["Summers"] was the primary resident of this address.  Summers was present at the time of the warrant and provided a statement to your Affiant and Det. Pankonie.  She admitted to knowing MONTANO.  She had first met him when he used to date her younger sister.  To note, it was at this time that investigators learned that MONTANO and Summers were not blood relatives but instead were actually just close friends.  Sometime thereafter, Summers had allowed MONTANO to move in with her.  However, Summers was having trouble with the Indiana Department of Child Services ["DCS"] over her ability to care for several juveniles that were in her custody.  She in turn began to have issues with MONTANO, because he kept bringing guns into her house, which violated DCS' rules.

19

Summers knew MONTANO to maintain a "Draco", which she last saw him with on July 28, 2020. She also knew him to be driving a blue car that day. She knew this, because MONTANO had come over to her house at some point to say hello.

39. The IMPD knew in their partnership with the management of the apartment complex that maintained 4118 Elmont Terrace that they maintained security cameras throughout the property. These cameras specifically recorded footage that captured the parking lot outside of the residential buildings. They provided the IMPD, and in turn your Affiant, access to these cameras. A review of this footage showed the following series of events on July 28, 2020 outside of 4118 Elmont Terrance:

    a. At 1:00 pm, the blue Ford Focus arrived into the complex and parked directly in front of 4118 Elmont Terrance. After idling for approximately one minute, a black male exited the driver's seat carrying what appeared to be a Draco NAK-9. Your Affiant observed a long, thin magazine protruding from its stock, which would be consistent with the type of magazine used for a Draco NAK-9. The male appeared to match the same height, weight, and physical stature of MONTANO. The male walked directly into Summers' residence. To note, the male was the only person recorded exiting from the vehicle.

    b. At 1:24 pm, the same male exited from 4118 Elmont Terrace again carrying the Draco NAK-9 in his hand. He entered the driver's seat of the Focus and then drove away from the complex. No other individuals entered it throughout this time.

    c. At 3:28 pm, the blue Ford Focus returned to 4118 Elmont Terrance. This time, it backed into a parking spot directly in front of the address, so that its license plate

was not visible unless you walked between the building and the car. The same male previously seen operating the vehicle then exited from the driver's seat about a minute after parking and walked towards the entrance to the apartment. Nothing was observed in his hands. However, he appeared to be attempting to hold his shirt over his waistline. In your Affiant's investigative experience, it appeared to me that the male was attempting to conceal something tucked into his waistline.

40.    On August 3, 2020, the IMPD Latent Print Unit confirmed through their analysis that the fingerprints collected from the back of VICTIM 7's Pontiac Grand Prix on July 28, 2020 belonged to MONTANO.

41.    In summary, it is your Affiant's belief that the evidence and statements accumulated throughout this joint robbery and homicide investigation ultimately uncovered an ongoing scheme facilitated by CAMPBELL and most often executed by MONTANO. Through their coordinated efforts, CAMPBELL would hunt for potential victims willing to carry large amounts of loose US currency on hand as they trustingly travelled to meet who they believed to be well-intentioned sellers. CAMPBELL would specifically lure them with the enticement of the sale of an expensive iPhone for a discounted price. He then directed them to locations that were accessible and comfortable to MONTANO, so that he could forcefully acquire the seeking buyers' money at gun point and flee with minimal resistance or detection.

42.    All of these events transpired within the Southern District of Indiana.

21

## III. <u>CONCLUSION</u>

43.     Based on the information detailed above, I believe there is probable cause that

CAMPBELL violated four counts of Title 18 United States Code, Section 1951(a)(1), and four

counts of Section 924(c), in that he facilitated and actively participated in three armed robberies

and one attempted armed robbery through online marketplaces between July 19, 2020 and July

28, 2020.  I further believe that there is probable cause that MONTANO violated two counts of

Title 18 United States Code, Section 1951(a)(1), and two counts of Section 924(c), in that he

participated in one robbery and one attempted armed robbery facilitated through online

marketplaces between July 20, 2020 and July 28, 2020.  Accordingly, I respectfully request the

Court to issue a Criminal Complaint and Arrest Warrants charging the Target Subjects with these

offenses.

FURTHER YOUR AFFIANT SAITH NOT


s/ *Leonard P. Rothermich*
Leonard P. Rothermich
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone.


Dated: August 12, 2020

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

22